IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| ELIZABETH A. SINGER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 3:09-cv-0674 |
| | ) |
| CRICKET COMMUNICATIONS WIRELESS | ) Judge Thomas A. Wiseman, Jr. |
| COMPANY, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Plaintiff Elizabeth A. Singer brings this action under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, as amended by the Civil Rights Act of 1991, and the Tennessee Human Rights Act ("THRA"), Tenn. Code Ann. § 4-21-101, alleging that defendant Cricket Communications Wireless Company ("Cricket") engaged in unlawful discrimination against her in her employment on the basis of gender and retaliated against her for making claims of discrimination. Cricket has filed a motion for summary judgment seeking judgment in its favor as a matter of law as to all claims asserted against it. For the reasons set forth herein, the Court finds that there are no material issues of disputed fact and that Cricket is entitled to summary judgment in its favor as to all claims asserted against it.

**I.    FACTUAL BACKGROUND**

Singer began her employment with Cricket on January 2, 2007 as a Retail Business Manager II ("RBM"). Prior to her employment at Cricket, Singer was a Retail Manager at T-Mobile. Tim Kring, an RBM at Cricket who had formerly worked with Singer at T-Mobile, recruited Singer to work at Cricket.

Prior to being offered employment at Cricket, Singer interviewed with Alan Lesser, who is currently a Zone Vice-President for Cricket but at the time was the Area General Manager, and Bill Boyce, the District Director. Although she was interviewed by Lesser and Boyce together, Boyce made the decision to hire Singer,[1] and Larinda Justice, Cricket's HR manager for the Nashville market at the time,

---

[1] Singer attempts to create a dispute as to this fact, and asserts in her affidavit that Cricket's Nashville Human Resources ("HR") Department and Alan Lesser were part of the decision-making team. (Singer Aff. ¶ 4.) Singer has no personal knowledge to back up that assertion, however. In any event, this fact is not material, as the Court will not apply the "same actor" inference.

called Singer and offered her the job of RBM. Boyce was Singer's direct supervisor throughout her tenure with Cricket.

When she began working at Cricket, Singer was responsible for two Cricket locations—the Green Hills store and the Clarksville kiosk—that were already under-performing. Throughout her employment, two other RBMs in the region also reported to Boyce, Tim Kring and Rick Houston. Kring was responsible for Cricket's Rivergate store; Houston was responsible for the Hickory Hollow store. Responsibility for the Clarksville kiosk was transferred at some point to Houston. Although the Three RBMs worked at different stores, they had close contact with one another and were generally aware of what the others were doing. (Singer Aff. ¶ 5.)

As an RBM, Singer's job duties included responsibility for sales and performance of the stores, management of inventory, day-to-day coaching and counseling of sales employees, and being out on the sales floor to greet customers and assist sales associates. Although being on the sales floor was a part of the RBM's job description, Singer testified that when she was hired, Boyce informed her that "this is not a job that you're going to be on the sales floor a lot. You're going to be in the back doing HR procedures, doing outreaching [sic], . . . team building, a number of things in the back." (Singer Dep. 136:13–18.) Boyce's directive to manage from the back of the store was contrary to Singer's previous retail management experience, where Singer had managed from the front of the store and was "on the floor quite a bit." (Singer Dep. 139:20.) After Jane Hutson came to work for Cricket as an Area General Manager around June 2007, and became Boyce's direct supervisor, "there was an increased emphasis placed on being out on the sales floor." (Boyce Dep. 52:5–7, 51:21–23.)

There is no dispute that from the beginning of her employment with Cricket, Singer had difficulty working for Boyce. She claims she became aware that Boyce was treating her differently than the two male managers in that he would not respond to her telephone calls or e-mails for days, and when he did finally respond, he often became confrontational, to the point of yelling or screaming at her. (Singer Aff. ¶ 7.) Singer began complaining about Boyce to Larinda Justice, HR Supervisor, in February 2007 about Boyce's lack of communication with her, among other topics. She continued complaining to Justice about Boyce for the remainder of the time she was employed at Cricket. She complained that Boyce did not respond to her communications, that he was confrontational, and that he yelled and screamed at her.

She complained that Boyce failed to provide her guidance or feedback and that he was "not treating the male managers the same way he treated [her]." (Singer Aff. ¶ 11.)[2]

According to Justice, Singer never told her that she was felt like she was being "treated differently." (Justice Dep. 65:14–18.) Justice also testified that Singer never used the words "retaliation" or discrimination," and that if she had, "that would have started this huge investigation" by Justice "as an HR person for Cricket." (Justice Dep. 65:2–4.) Instead, Justice understood that Singer felt like Boyce was "always mad at her and she couldn't do anything right." (Justice Dep. 65:18–20; *see id.* at 65:20 ("We had a lot of those conversations.").) During one of Singer's early conversations with Justice in February 2007, Justice sympathized with Singer, stating that "Cricket is different you know," and that Boyce was "just a man." (Singer Dep. 196:5, 12.) Justice also told Singer she (Justice) had to "cover" Boyce's job and "do a lot of things for him." (Singer Dep. 196:13–15.) Justice testified, however, that all the store managers, Kring and Houston as well as Singer, "had issues with [Boyce's] communication or lack of communication skills, lack of direction, his management style" (Justice Dep. 16:1–3), and they all complained that he did not "respond" to them or return their phone calls. (Justice Dep. 16:24–25.) They also complained about lack of coaching and training. According to Justice, this was a "continuous theme . . . . [T]hey all felt that they were kind of out on their own as a store manager." (Justice Dep. 24:12–13.) She received many complaints about Boyce's lack of communications from the male employees Boyce supervised as well, particularly Tim Kring, who complained about the lack of communication, lack of support, and lack of recognition for the things he did well. (Justice Dep. 27:11–16.) Justice perceived that Singer was equally as hard on Kring as he was on Singer. (Justice Dep.42:1–13.)

Singer admits she was aware that some of the other employees supervised by Boyce, including Angelo Carruthers, Assistant Retail Business Manager at the Green Hills store, Michelle Walker,

---

[2] Singer testified in her deposition that she had "no idea" whether Kring and Houston were having similar communications problems with Boyce. (Singer Dep. 151:8.) She now claims, in an affidavit created for the purpose of refuting the defendant's motion for summary judgment, that she asked Kring if Boyce yelled and screamed at "them," and he told her he did not. She also claims that when she had not heard from Boyce, she would call Kring and Houston and they would tell her he had talked to them earlier. She asserts she could somehow see that Boyce was responding to Kring's and Houston's e-mails. Because these averments are in direct conflict with her deposition testimony, the Court accords them little credit. *Cf. Lanier v. Bryant,* 332 F.3d 999, 1004 (6th Cir. 2003) ("When a motion for summary judgment has been filed, a party cannot create a factual issue by filing an affidavit which contradicts earlier testimony." (citations omitted))*.* In any event, the Court concludes that this dispute is not material.

Inventory Sales Representative at the Green Hills store, as well as Kring, also felt that Boyce treated them unfairly, for various reasons. (Singer Dep. 73:25–74:15, 79:1–13; 104:3–21.) For instance, Kring was upset that Boyce "unfairly ridiculed" and "belittled" him in front of the other managers, stating that Kring needed to be able to handle his staff better and needed to be able to keep his staff. (Singer Dep. 104:23–25, 106:20–21.)

Shortly after Jane Hutson began working as Boyce's supervisor in June 2007, Hutson had "stair-step" meetings separately with all three of the RMBs supervised by Boyce. She met with Singer in Singer's office in the back of the Green Hills store, at which time Singer told Hutson that Boyce did not communicate with her, would take days to respond to e-mails, and would not answer his cell phone when she called. Singer also maintains, in the affidavit submitted in conjunction with her opposition to summary judgment, that she told Hutson that Boyce "communicated better with the male managers" than he did with her. (Singer Aff. ¶ 13.) In her deposition, however, Singer was asked specifically whether she told Hutson that Boyce communicated better with the male managers than with her, to which she responded, "I may have. I don't recall." (Singer Dep. 151:13.) In addition, as indicated above, she testified unequivocally that, at the time she had this discussion with Hutson, she had "no idea" whether Kring or Houston was having similar communications-related problems with Boyce:

> Q. Before you had this conversation with Ms. Hudson [sic] –
>
> A. Uh-huh.
>
> Q. – did you have any information that Mr. Kring and Mr. Houston were having the same kinds of problems communicating with Mr. Boyce, that they would either call him and he wouldn't answer his phone or they would send him e-mails and it would take him days to respond?
>
> A. No. I wasn't aware of that.
>
> Q. So you don't know one way or the other if they were having those same problems?
>
> A. No. No. And I'm sure they would have told me. But, no, I have no idea.

(Singer Dep. 150:18–151:8.)

> Q. . . . . I think you've just told me you had no idea whether they were having that same problem with him or not.
>
> A. Right.

(Singer Dep. 151:19–22.)

In any event, it was apparently also at this meeting that Singer mentioned to Hutson that Boyce had instructed her to manage her store "from the back," instead of from the floor, which was contrary to her prior retail management experience. (Singer Dep. 138:4–13921.) According to Singer, Hutson told her during that meeting that she would talk to all the managers to discuss this issue. (Singer Dep. 138:11–12.) Singer also alleges that at the end of the meeting Hutson apologized to her for Boyce's behavior and said she would talk to him about the communication issue and see that the problem was fixed. (Singer Aff. ¶ 13.) The problem apparently was not fixed, however.

Some time after the meeting between Hutson and Singer, Boyce and Singer had a meeting during which Boyce gave Singer her annual review. At this meeting, Boyce also allegedly assigned to Singer a number of new tasks and duties that she had not theretofore been required to perform. These new duties included working the sales registers, processing in-store customer bill payments, being a greeter, and being on the sales floor 90% of the time. Boyce also directed her to "open" and "close" her store every day. (Singer Aff. ¶ 15; Kring Aff. ¶ 5.) After Singer was assigned these additional duties by Boyce, she ended up working thirteen days straight. Singer apparently maintains that Boyce's assigning these tasks to her was both discriminatory, in that the male RBMs were not required to perform these extra tasks, and retaliatory, in response to her having complained about him to Jane Hutson.[3] Singer further alleges that when she went to Boyce and asked him why he was having her perform these tasks that the male RBMs were not required to do, he "screamed" at her on the phone, telling her it was "because he said so"; he allegedly repeated screamed at her: "You just don't get it." (Singer Aff. ¶ 14.)

After this "screaming" conversation, Singer complained again to Larinda Justice. Justice sympathized with her, expressed her regret that Boyce had "attacked" Singer on the phone, and agreed that this behavior "had to stop." (Singer Dep. 141:1–7.) She also told Singer that she would discuss the matter with Hutson. Justice testified that she recalled speaking with Boyce and either to Jane Hutson or to Alan Letser after Singer complained about his "screaming" at her in a telephone call. (Justice Dep. 44:9–45:14.) Boyce did not believe he had screamed, and Justice remembered counseling him that what

---

[3] Singer acknowledges that her store was an "underperforming" store compared to the Hickory Hollow and Rivergate stores, and was underperforming from before she began working there. She also acknowledges that after she began managing "from the front" and performing the additional tasks assigned by Boyce, the Green Hills store's performance improved. (Singer Dep. 134:23–25.)

mattered was how the employee perceived what he did. (Justice Dep. 45:10–16.)

It is unclear whether it was that same conversation with Justice or another conversation altogether, but on or about August 24, 2007, Singer went to Justice to tell her she was resigning. She had an hour-long conversation with Justice in which she related the details of the "screaming" conversation and reiterated her various problems with Boyce—that he did not communicate with her, that he was giving her extra duties that he was not giving the male RBMs, that he would "confuse" her employees by giving conflicting instructions, that he threatened to give her a bad review. (Singer Dep. 142:20–22.) Justice urged her not to resign, and told her again that she was sorry about Boyce's treatment of her. Justice agreed that this behavior had to stop, and told Singer that she would discuss the matter with Hutson. Singer agreed not to resign at that time.

It is unclear whether Justice thereafter spoke with Hutson, or whether Hutson and Singer had another meeting. Regardless, there is no evidence that either Hutson or Justice ever told Boyce that Singer had complained *to Hutson* about him.[4] Singer alleges in her affidavit that she "recalls" that Justice later told her that "Boyce knew that Hutson had spoken to [Singer] about his behavior." (Singer Aff. ¶ 13.)[5] That testimony is in direct conflict with her earlier deposition testimony which demonstrated she had no evidence to support her speculation that Boyce knew she had "told on him." Specifically, in her deposition, she stated that she believed Boyce knew she had "told on him," by which she meant that he knew she had "gone to Ms. Hudson [sic]." (Singer Dep. 158:17–21.) When asked why she held that belief, she was unable to substantiate it with anything resembling evidence:

> Q. Okay. Other than the fact that he came to you and asked you to resign after you had gone to his boss to complain about him, do you have any other basis for linking his request for your resignation to your complaint?
>
> A. Attacking me on the phone. I mean, I don't know. That's a big question. That's a big one.

---

[4] As set forth above, there is some evidence that Justice told Boyce that Singer had complained to her (Justice) about the "screaming" incident.

[5] Singer also attempts to bolster her claim that Boyce knew that Singer had complained to Hutson about him with the affidavit of Tim Kring, in which Kring avers that Boyce called him after Hutson had met with all three RMBs and asked questions "that made it clear he knew someone had complained about his behavior and Hutson had been interviewing employees about him." (Kring Aff. ¶ 9.) This testimony is entirely too vague to support an inference that Boyce knew anyone had complained to Hutson about him, much less that Singer specifically had complained about him.

> Q. Well, you're the one who's making the claim that he retaliated against you because you went to your [sic] boss.
>
> A. Right.
>
> . . . .
>
> Q. Why – how – what's your basis for saying that's why he did it?
>
> A. To me there is no other explanation. That's – he knew that I had told on him and he – I never – Jane said that, you know, there were going to be some changes. Those weren't done.
>
> Q. And so I understand, in terms of him knowing you told on him, how did he know that you had gone to Ms. Hudson?
>
> A. Larinda [Justice].
>
> Q. And how do you know – and what does that mean?
>
> A. What does that mean? I guess ask me a different way. I don't know how to respond to that.
>
> Q. You're telling me that he knew you told on him. And I assume that means that he knew you had gone to Ms. Hudson; is that right?
>
> A. Yes.
>
> Q. Okay. How did he know?
>
> A. I – I was under the impression it would be Larinda because Larinda was telling him quite a few things, so . . .
>
> Q. So you're making an assumption that Larinda told him that you had gone to Ms. Hudson [sic]?
>
> A. I'm just trying to remember back , , , , I talked to Larinda. I . . . told her that he had come to me and asked me to resign. . . . And she said, you know, that she hated it, that there were a lot of changes Bill was going through as well with his boss; that he was going through hell. That's what was said to me. . . . And I said, well, did – you know, did he know that I came forward? And she said, I'm quite sure he knows everyone did because Jane [Hutson] went to every manager and did a stair-step interview. So that would be what I'm basing that on.

(Singer Dep. 157:6–159:21.).

> Q. Okay. So that tells me that Bill Boyce would know that Jane Hudson met with all of the managers, including you. I'm not sure how you get from that to Bill Boyce knew that you, quote, told on him to Jane Hudson [sic].
>
> A. I don't know.

(Singer Dep. 160:11–16.)

Boyce testified in his deposition that did not recall ever being told by Justice or Hutson that Singer had a problem with the way he was treating her. (Boyce Dep. 133:18–25.) Boyce recalled that Hutson

did meet with him but did not inform him specifically that Singer had complained about him. Rather, Hutson discussed the substance of Singer's complaints, such as Singer's frustration with her job: "To the best of my recollection, she [Hutson] indicated that Ms. Singer was frustrated with her job, that she was, she felt like Ms. Singer was a little overwhelmed. I remember her asking if Ms. Singer was the right person to run that store, and I remember talking about me spending more time in Ms. Singer's stores." (Boyce Dep. 137:11–16.) He further recalled that he and Hutson agreed that Singer needed more "support," more "day-in and day-out support running her store, help getting the store organized, those types of things, just day-to-day operational support." (Boyce Dep. 138:23–25.)

Jane Hutson has testified, via declaration, that she met with Singer in approximately August 2007, at which time Singer complained to her about Boyce. After that meeting, Hutson met with Boyce, but she did not inform Boyce that Singer had complained about him. Rather, she emphasized that all RBMs, including Singer, needed "to manage from the sales floor." (Hutson Decl. ¶¶ 3–4.)

On September 21, 2007, approximately a month after Singer originally tendered and then rescinded her resignation to Justice, Boyce came to the Green Hills store and told her he wanted to talk to her in the back. In her deposition, Singer testified that they went to her office and Boyce

> sat down at the desk with his laptop and started saying . . . you know, Elizabeth, I want to talk to you – I want you to think real carefully about what I'm about to ask you. And I was thinking, okay. And he said, I want you to rethink your resignation. . . . I said, why? And he said, I just – you don't got to give me an answer now. He said, I just want you to think about it, and it would be in your best interest if you considered it. If you stay, you will have to do even more duties than what I've already outlined. . . . [Y]ou're going to have to do your own inventory.
>
> And I argued with him and said, we have inventory specialists for that. Why would I be the only manager to do that? And he said – I don't remember what he said after that, that part of it. But he just said, you will be required to do more duties than what you're already doing now.

(Singer Dep. 164:22–165:22.)

In her affidavit prepared for purposes of contesting summary judgment, Singer avers that she and Boyce went into her office and Boyce

> closed the door behind him, and he sat down in front of me and leaned in so that he was only about eighteen (18) inches from my face. Boyce was hostile and angry. He stared at me and was very intimidating. He said he wanted me to 'rethink' my resignation and that it would be in my "best interest to consider resigning." I was frightened. He told me that if I stayed, I would have another new duty, which was doing my own inventory.

(Singer Aff. ¶ 16.) Singer claims she was physically afraid of Boyce during this closed-door meeting and that "it was clear to [her] that he would not leave the office until [she] agreed to resign." (Singer Aff. ¶

16.)[6]

In both versions of this incident, Singer alleges she told Boyce that she would resign but that she wanted to "leave professionally." (Singer Dep. 166:19–20; Singer Aff. ¶ 16.) Boyce told her he would help her do that, and then told her what she should say in her resignation letter and when to send it. (Singer Dep. 166:21–167:2.) Shortly thereafter, Singer e-mailed a resignation letter to Boyce. The e-mail stated: "Bill, per our conversation, this is just a note to let you know after much thought, I have decided to step away from Cricket, and pursue other avenues." (Singer Dep. Ex. 4.) She also gave two weeks' notice. Boyce never responded to the resignation letter.

After sending her e-mail to Boyce, Singer then called Justice to inform her that Boyce had asked her to resign. Justice allegedly responded with outrage that Boyce had done so, telling Singer that Boyce was a "f***ing idiot" and that "he should not have done that." (Singer Aff. ¶ 18.) Justice told her she would speak to Boyce and to Hutson and call her back. Justice called Singer back after speaking with Boyce, who denied asking Singer to resign. Hutson, however, had suggested a meeting among the four of them to discuss the matter. Singer declined to attend such a meeting. She asserts that her reason for refusing to meet was because she understood that Boyce was going to continue denying that he had asked her to resign, and because nothing had been done about her past complaints. (Singer Aff. ¶ 20.) She was never asked by anyone at Cricket to rescind her resignation.

Singer was temporarily replaced by an African-American woman, Angela Walker. (Boyce Dep. 49:10–12.) Her permanent replacement was a man, Allen Ashmore, referred by Jane Hutson. (Boyce Dep. 49:13–16.)

Singer thereafter filed a timely charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). She received a Notice of Right to Sue from the EEOC on April 24, 2009, less than ninety days prior to filing her complaint in this action.

## II. STANDARD OF REVIEW

Under Rule 56, a "party against whom relief is sought may move . . . for summary judgment on all or part of a claim." Fed. R. Civ. P. 56(a). Summary judgment for the moving party is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c)(2). As the Supreme Court has explained, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v.*

---

[6] After Justice told Singer that Boyce denied asking her to resign, Singer suggested to Justice that they watch the security tape. Justice told her the tape would have video but no sound. (Singer Dep. 168:10–16.) Cricket HR Director Kelli Ellis later requested a copy of the video footage documenting the meeting between Boyce and Singer in Singer's office, to see if their mannerisms might reveal anything. (Justice Dep. 86–88.) The footage was apparently unavailable by that time.

*Catrett*, 477 U.S. 317, 322 (1986).

In deciding a motion brought under Rule 56, this Court must view the evidence in a light most favorable to the nonmoving party. *Pack v. Damon Corp.*, 434 F.3d 810, 813 (6th Cir. 2006). The nonmoving party, however, "may not rely merely on allegations or denials in its own pleading," but "must—by affidavits or as otherwise provided in [Rule 56]—set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). Any supporting or opposing affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). Finally, "the mere existence of a scintilla of evidence that supports the nonmoving party's claims is insufficient to defeat summary judgment." *Pack*, 434 F.3d at 814 (alteration, internal quotation marks, and citation omitted).

### III. ANALYSIS AND DISCUSSION

Singer makes two distinct claims in this action: (1) that Boyce discriminated against her by treating her differently than he treated the two male RBMs, and (2) that Boyce retaliated against her for complaining about him to his supervisor, Hutson, by assigning her additional duties that the male RBMs were not required to perform, and later by asking her to resign and threatening her with even more additional duties if she did not do so, thereby constructively discharging her. Cricket has filed its motion seeking summary judgment in its favor on both these claims.

#### A. Singer's Discrimination Claim

In order to state a *prima facie* case of disparate-treatment sex discrimination under either Title VII or the THRA, a plaintiff must show that (1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position; and (4) similarly situated non-protected employees were treated more favorably than she, or she was replaced by a person outside the protected class. *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004); *Phillips v. Interstate Hotels Corp. No. L07*, 974 S.W.2d 680, 683–84 (Tenn. 1998) ("Although the language differs slightly, it is clear that the [Tennessee] legislature intended the THRA to be coextensive with federal law. [Courts], therefore, may look to federal interpretation of Title VII for guidance in enforcing [Tennessee's] anti-discrimination statute." (internal citation omitted)); *see also Reed v. Cracker Barrel Old Country Store, Inc.*, 133 F. Supp. 2d 1055, 1075–76 (M.D. Tenn. 2000) (acknowledging that Tennessee courts have applied the *McDonnell Douglas* burden-shift framework in analyzing THRA claims).

Cricket argues that Singer cannot establish that she was subjected to an adverse employment action; Cricket also contends that Singer cannot show that male employees were treated more favorably than she, or that she was replaced by a person outside her protected class. As set forth below, the Court agrees that Singer cannot show that she suffered an adverse employment action as required to state a *prima facie* case of discrimination under

either Title VII or the THRA. The defendant's motion for summary judgment as to the discrimination claim will be granted on that ground, and the Court will not reach the question of whether Singer can show that she was treated less favorably than her male counterparts or was replaced by a person outside her protected class.

### *(1) Singer Cannot Show She Suffered an Adverse Employment Action.*

An "adverse employment action" is one that "affect[s] employment or alter[s] the conditions of the workplace." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 62 (2006). Generally, it involves changes in the terms of employment, such as "hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits," and usually "inflicts direct economic harm." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761–62 (1998); *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 402 (6th Cir. 2008). Such a change "must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Hollins v. Atl. Co.*, 188 F.3d 652, 662 (6th Cir.1999). *"[D]e minimis* employment actions are not materially adverse and, thus, not actionable." *Bowman*, 220 F.3d at 462 (citations omitted); *cf. Novotny v. Elsevier*, 291 F. App'x 698, 703 (6th Cir. 2008) (holding that plaintiff's allegations that "her calendar was closely scrutinized, she was left off of out-of-office emails, she was referred to executive coaching, she was pushed for inputs on her development plan, and she was placed on a [Corrective Action Plan]" were not sufficient to show she suffered an adverse employment action for purposes of a *prima facie* case of discrimination); *Monak v. Ford Motor Co.*, 95 F. App'x 758 (6th Cir. 2004) (holding that plaintiff had not shown she was subject to an adverse employment action despite claims that she was not permitted to return to the same shift and job she had before going on medical leave, and that she was screamed at, unfairly criticized, and treated rudely by several supervisors, as there was "no proof that these acts involved a detrimental change in [her] pay, benefits, or on-the-job hours"); *Agnew v. BASF Corp.*, 286 F.3d 307, 310–11 (6th Cir. 2002) (holding that being placed on performance improvement plan does not constitute an adverse employment action); *Kocsis v. Multi-Care Mgmt.*, 97 F.3d 876, 885 (6th Cir. 1996) (holding that "reassignments without salary or work changes do not ordinarily constitute adverse employment decisions in employment discrimination claims").

In the present case, Singer complains that Boyce discriminated against her by not communicating as well with her as he did with her two male counterparts, in that he would not respond to her e-mails or answer her phone calls. She claims he provided "guidance and feedback" to the male employees but not to her, and that he occasionally socialized outside work with them but not with her. She also alleges that Boyce required her to perform duties the male employees were not required to do, including that she operate a sales register, process in-store customer bill payments, be a greeter, and "be on the floor 90 percent of the time." (Singer Dep. 131:7–9.) She acknowledges that most of these tasks actually are part of her job description, but contends that she was required to

be on the floor more than the other RBMs, and to perform the tasks of a sales associate in addition to her own managerial duties. She further alleges that when she asked Boyce why she was required to perform these new tasks, he screamed at her on the telephone that she just did not "get it." (Singer Dep. 132:3–8.)

The Court acknowledges that there is scanty evidence in the record to support Singer's claim that Boyce treated Kring and Houston better than he treated her in the first place. Regardless, even assuming that Singer could prove the above-referenced acts, these allegations alone are not sufficient to establish that she suffered an adverse employment action. Singer was not demoted and her salary did not change. Although she alleges she, on one occasion, had to work thirteen days in a row without a break, a single instance of working through a weekend still does not qualify as an adverse employment action.[7] In addition, however, Singer alleges that she suffered an adverse employment action when Boyd "forced" her to resign. (Doc. No. 24, at 13–14.) Because Singer's other allegations are not sufficient to establish an adverse employment action, her claim hinges upon whether she can show that she was constructively discharged.

*(a)     Whether Plaintiff Was Constructively Discharged*

An employee who resigns her post can recover from her former employer for constructive discharge under Title VII if the employer engaged in conduct that forced the employee to quit. "[T]he employer must deliberately create intolerable working conditions, as perceived by a reasonable person, with the intention of forcing the employee to quit and the employee must actually quit. To determine if there is a constructive discharge, both the employer's intent and the employee's . . . feelings must be examined." *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

The Sixth Circuit has adopted several factors to assist district courts in the determination of whether the employer created working conditions that a reasonable person would find intolerable. *Logan v. Denny's Inc.*, 259 F.3d 558, 569 (6th Cir. 2001). The presence of any combination of the following factors suggests constructive discharge, although whether working conditions are intolerable must be determined on a case-by-case basis: "(1) demotion; (2) salary reduction; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee to resign; or (7) offers of early retirement or continued employment on less favorable terms." *Id.* (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)). Generally, the existence of

---

[7] Singer complains about being assigned additional duties, but she also acknowledges that Boyce, around the same time, transferred responsibility for the Clarksville kiosk to Houston. Singer has not indicated what effect this reassignment had on the overall quantity of work for which she was responsible, but she presumably had some increased capacity—and Houston apparently took on additional work—once she was no longer responsible for the Clarksville kiosk.

a Title VII violation, standing alone, is not sufficient to prove that a plaintiff was constructively discharged. *Coffman v. Tracker Marine L.P.*, 141 F.3d 1241, 1247 (8th Cir. 1998). Rather, "unless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." *Penn. State Police v. Suders*, 542 U.S. 129, 147 (2004) (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997)).

The Sixth Circuit has repeatedly held that the manner in which an employer assigns job duties to an employee and the employer's criticism of the employee's performance "normally are insufficient to establish a constructive discharge as a matter of law." *Dendinger v. Ohio*, 207 F. App'x 521, 527 (6th Cir. 2006) (quoting *Smith v. Henderson*, 376 F.3d 529, 534 (6th Cir. 2004) (citing *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 496 (8th Cir. 1996) ("Dissatisfaction with a work assignment is, as a matter of law, normally not so intolerable as to be a basis for constructive discharge."); *Carter v. Ball*, 33 F.3d 450, 459 (4th Cir. 1994) ("Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign."))).

Under the circumstances presented here, the Court finds that Singer has not established a constructive discharge. She was not demoted; her salary was not reduced, nor did she experience a reduction in job responsibilities. Her work-load was allegedly increased, but she has not been reassigned to menial or degrading work. Instead, she basically insists that she was harassed and humiliated by Boyce in a manner calculated to encourage her to resign, and threatened with continued employment on less favorable terms. For the most part, however, the actions to which Singer points in support of her claim for constructive discharge are the same actions she claims amount to gender discrimination: She was assigned additional job duties that were not assigned to her male counterparts; Boyce was disrespectful to her ("screamed" on the telephone) and communicated better with the male RBMs than with her. Those allegations alone are not sufficient to create an objectively intolerable work environment. While Singer has alleged that the additional duties assigned to her caused her to work more than her male counterparts, she has not shown that the work was so onerous that a reasonable employee would have felt compelled to resign because of it. *Cf. Policastro v. Nw. Airlines, Inc.*, 297 F.3d 535, 539 (6th Cir. 2002) ("For a . . . reassignment to amount to a constructive discharge, its conditions must be objectively intolerable to a reasonable person."). Singer also alleges that Boyce "threatened" that she would be assigned even more duties if she stayed, specifically, that she would have to do her own store inventory, but she has not shown that the mere possibility of additional work, which may or may not have turned out to be as onerous as she expected, was objectively so intolerable as to compel a reasonable employee to resign rather staying on the job while seeking redress for discrimination.

Singer attempts to overcome the requirement that she show something more than "ordinary" discrimination

by alleging in an affidavit that Boyce, during the meeting in which he allegedly suggested she think about resigning, positioned himself eighteen inches from her face and behaved in a manner she subjectively interpreted as physically threatening, and that she believed that he would not leave her office until she agreed to resign. Her affidavit testimony regarding that meeting, however, is completely at odds with her deposition testimony regarding the same event, and the Court will disregard Singer's affidavit testimony to the extent it conflicts with her prior deposition testimony. *See Lanier v. Bryant,* 332 F.3d 999, 1004 (6th Cir. 2003) ("When a motion for summary judgment has been filed, a party cannot create a factual issue by filing an affidavit which contradicts earlier testimony." (citations omitted)). In her deposition, she testified that Boyce sat down at her desk behind his laptop computer, and, although he allegedly suggested she think about resigning, he also suggested she take the weekend to think about it. That testimony is completely contradicted by her new testimony that she believed he would not leave her office until she agreed to resign. Moreover, her claim that she felt physically threatened is belied by her admitted awareness that the entire interaction was being captured on the security video tape. She also offers no rationale as to why she could not have simply stood up and walked out the door.

Finally, her claim that she was "forced" to resign is further belied by the fact that when she called Larinda Justice to tell her she had submitted her resignation at Boyce's request, Justice expressed dismay and anger at Boyce's action, and, after conferring with Hutson, suggested a meeting among herself, the plaintiff, Boyce, and Hutson to discuss the matter further. Singer declined to participate in such a meeting, allegedly because she believed that Boyce would lie about whether he had asked her to resign, but that explanation does not support her claim that she was "forced" to resign, particularly given that she had no reason to believe that Hutson and Justice would believe or support Boyce rather than her.

In sum, while Singer has created an issue of fact as to whether she subjectively felt she had no choice but to resign, and as to whether Boyce's actions were intended to result in her resignation, she has not shown that her circumstances were so objectively intolerable that a reasonable employee would have felt no choice but to resign. The facts viewed in the light most favorable to the plaintiff do not establish constructive discharge, nor do they establish that the plaintiff suffered any other adverse employment action of the type required to support a claim of discrimination under either Title VII or the THRA.

The defendant's motion for summary judgment as to the plaintiff's discrimination claim will therefore be granted.

### B. Singer's Retaliation Claim

To maintain a claim for retaliation under either Title VII or the THRA, Singer must establish that (1) she engaged in activity protected by statute; (2) Cricket—and more specifically Boyce, as the person who allegedly

retaliated against her—knew that she engaged in protected activity; (3) the employer thereafter took a materially adverse action against Singer or subjected her to severe and pervasive retaliatory harassment; and (4) the adverse action was causally related to the protected activity. *Ladd v. Grand Trunk W. R.R., Inc.*, 552 F.3d 495, 502 (6th Cir. 2009) (citing *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 523 (6th Cir. 2008)); *Newsom v. Textron Aerostructures*, 924 S.W.2d 87, 96 (Tenn. Ct. App. 1995). The Court finds that Singer cannot establish a *prima facie* case of retaliation, because she cannot show that she either engaged in protected activity, or that Bill Boyce knew she engaged in protected activity.

### *(1) Singer Has Not Shown She Engaged in Protected Activity.*

To show that she engaged in activity "protected by statute," Singer must establish that she "opposed" any unlawful employment practice under Title VII, or that she "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing" regarding an unlawful employment practice under Title VII. 42 U.S.C. § 2000e-3(a). In this case, Singer is asserting that she "opposed" unlawful gender discrimination on the part of Boyce by "telling on him" to his boss, Jane Hutson, and that Boyce retaliated against her as a result by giving her more work, screaming at her and demeaning her, and ultimately pressing her to resign. (*See* Pl.'s Resp. Opp. Summ. J, Doc. No. 24, at 16 (stating that plaintiff engaged in protected activity "by complaining to Hutson about what she reasonably believed to be discrimination").)

There is no dispute that Singer complained about Boyce to Hutson. Notwithstanding, there is no competent evidence that Singer communicated to Hutson that her complaint was based on *gender discrimination* as opposed to mere bad management style and poor communication. In her deposition, Singer was asked whether she informed Hutson that Boyce "communicated better with the male managers than with Singer"; her response was: "I may have. I don't recall." (Singer Dep. 151:9–13.) Hutson and Justice both deny informing Boyce that Singer had complained that he was treating her differently than the male managers, and Boyce denies being told that that Singer had "told on him" to Hutson. Notwithstanding, in her affidavit, Singer has suddenly recalled unequivocally that she actually did inform Hutson that Boyce communicated better with the male managers than with Singer. (Singer Aff. ¶ 13.) Even if the Court were to credit Singer's recent recollection, Singer's telling Hutson that Boyce communicated better with the two male managers than he did with her does not, standing alone, constitute protected activity. A complaint that Boyce communicated better with the other two managers—who happen to be male—than with her does not amount to a complaint that Boyce was discriminating against her *because* of her gender. Nor does it amount to "opposing" an employment practice made unlawful by Title VII.

In short, the fact that Singer complained to Hutson about Boyce's treatment of her did not, on its own, trigger the protections of Title VII. There is no evidence in the record that Singer communicated to Hutson that she believed

Boyce was treating her differently than the male managers because of the fact that she was a woman. She has not shown that she opposed activity prohibited by Title VII (or the THRA).

### *(2) Singer Has Not Shown that Boyce Knew She Engaged in Protected Activity.*

Even if it could be assumed that the plaintiff had engaged in protected activity, and that Boyce knew Singer had complained about him to Hutson, there is no competent evidence in the record to support an inference that either Hutson or Justice told Boyce that Singer had made complaints of *discrimination* against him.

There is very little basis for an inference that Boyce was aware that Singer had complained to Hutson about him at all. Boyce testified that he was aware that Singer was frustrated with her job, but he did not recall anyone ever telling him that Singer had a problem with him *per se*. Justice testified that she had communicated with Boyce that Singer had come to her alleging that Boyce had screamed at her on the phone.[8] She also testified, however, that if Singer had said the words "discrimination" or "retaliation," she would have immediately opened a file and begun investigating such a claim. (Justice Dep. 65:2–4.) She did not do that in this case. Hutson testified via a declaration that she did not inform Boyce that Singer had complained about him at all. (Hutson Decl. ¶ 4.)

Regardless, even if the Court assumes that Boyce knew that Singer had complained about his treatment of her, Singer has not pointed to any evidence suggesting Boyce was aware that Singer had complained that he was discriminating against her on the basis of sex. In other words, even if Boyce knew Singer had a problem with him, there is not a shred of evidence in the record, circumstantial or otherwise, that Boyce had knowledge that Singer had engaged in "protected activity." The banal act of complaining about one's boss does not qualify as protected activity.

For these reasons, Singer's retaliation claim necessarily fails. The defendant is entitled to summary judgment as to this claim as well.

## IV. CONCLUSION

It is evident to the Court that the evidence mustered by the plaintiff in this case amounts to no more than the now proverbial scintilla: Even viewing the facts in the light most favorable to the plaintiff and drawing all reasonable inferences in her favor, no reasonable jury could find that the plaintiff was discriminated against on the basis of her gender, or that she was retaliated against for engaging in protected activity. It is apparent that her former boss was difficult and unpleasant, but he apparently communicated poorly on an equal-opportunity basis—leaving both the men and women who reported to him dissatisfied with his management style.

---

[8] To be clear, Singer's claim is *not* based on an allegation that Boyce knew she had complained about him to Justice. Her claim is based on an allegation that Boyce knew she had complained about him to his boss, Hutson.

The defendant is entitled to summary judgment in its favor.  An appropriate order will enter.

Thomas A. Wiseman, Jr.
Senior U.S. District Judge